Norris Lynn WALTON, Appellant,

v.

CHARLES PFIZER & COMPANY, INC., a corporation, et al., Appellees.

No. 49833.

Supreme Court of Oklahoma.

Dec. 26, 1978.

As Corrected on Denial of Rehearing Feb. 12, 1979.

C. Rabon Martin, Baker, Baker & Martin, Tulsa, for appellant.

Waldo F. Bales, City Atty., Tom R. Gann, Asst. City Atty., Tulsa, for appellees.

WILLIAMS, Justice.

In 1966, the Variety Health Clinic, an out-patient health clinic operated and maintained by the City of Tulsa through the Tulsa City-County Health Department, administered to plaintiff, Norris Lynn Walton, free of charge, three different kinds of vaccines at the same time. From these vaccines, plaintiff allegedly suffered adverse reactions consisting of permanent paralysis of the lower extremities and damage to the lower organs of the body, including incontinence of the bladder.

In 1973, within one year after attaining his majority, plaintiff filed an action for damages against the City of Tulsa, the County of Tulsa, and several private corporations involved in the manufacture, distribution and sale of the vaccines. After time-consuming proceedings during which several sets of interrogatories, consisting of several hundred questions, were propounded and answered, plaintiff dismissed the action as to all defendants except the City of Tulsa.

Thereafter the City of Tulsa took the position that the tort sued upon arose out of the performance of a governmental function and filed a motion for summary judgment for plaintiff in the amount of $2000, the applicable limitation provided in 11 O.S. 1971, Sec. 1755(a)(1), a portion of the Governmental Tort Liability Act which became effective on July 1, 1965. Under that act, the City of Tulsa was liable for any tort "arising out of the performance of a governmental function" (Sec. 1753) within the limits set out in Sec. 1755. It may be observed also that in Sec. 1761, the doctrine of "governmental immunity from tort liability" was enacted as a rule of statutory law, subject to the provisions of the act.

The motion for summary judgment was sustained and judgment was entered for plaintiff for $2000. In the judgment, the trial court found in effect that upon the basis of the record and pleadings before it, including a stipulation between plaintiff and the City of Tulsa, there was no substantial controversy as to any material fact, and that the tort sued upon arose out of the performance of a governmental function. Plaintiff appeals.

█ In this Court, the brief of plaintiff (appellant) includes a discussion of the history, and the philosophical and political basis, of the doctrine of sovereign immunity, and the principal argument advanced is that this Court should abrogate the doctrine as "a figment of the judicial imagination". Much of the discussion is taken from the early case of *Chisholm, Ex'r v. Georgia,* 2 U.S. 419, 2 Dall. 419, 1 L.Ed. 440, and " * * * it is *strongly* recommended that *Chisholm v. Georgia* be read in its entirety; as the most intelligent judicial utterance on governmental immunity through America's 200 years, it is worth reading".

We have accordingly done so. At the outset, it appears that plaintiff is laboring under a basic misconception as to what was actually decided in *Chisholm,* which was promulgated in 1793, before the 11th Amendment of the United States Constitution was adopted. In appellant's brief, it is said:

"The new U.S. Constitution vested the Supreme Court of the United States with jurisdiction to resolve controversies ' * * * between a State and Citizens of another State * * * '. However, the Constitution was silent with respect to controversies between a state and a citizen of *that* state, so when Chisholm sued the State of Georgia in 1792, a case of first impression was presented to the Supreme Court of the United States. * * * "

*Chisolm* was a case of first impression, but not for the reason suggested in plaintiff's brief. The opening presentation of Attorney General Randolph, representing the plaintiff, at page 440 of 1 L.Ed., shows that Chisholm was not a citizen "of *that* state" (Georgia), but was a citizen of South Carolina. It also shows that the action

against Georgia was an action in assumpsit, and not, as in the case now before us, an action sounding in tort.

Thus, *Chisholm* was not a case in which a state was sued in tort of its own citizens, but a case in which a state was sued in assumpsit by a citizen of another state. Under Article III, Sec. 2, of the United States Constitution (as originally adopted), the judicial power of the United States extended to controversies "between a State and Citizens of another State", and the United States Supreme Court was given original jurisdiction of all cases "in which a State shall be a Party". The question of first impression presented by *Chisholm* arose because, for the first time in such a case, the state denied the jurisdiction of the U.S. Supreme Court.

The ruling of the U.S. Supreme Court in *Chisholm* in effect sustained a motion by Attorney General Randolph, as counsel for the plaintiff, to require Georgia, after notice, to appear and defend, or to suffer a default judgment. Georgia was represented by Ingersoll and Dallas, who presented a "written remonstrance and protestation" against the exercise of jurisdiction, but "in consequence of positive instructions" declined to participate in the argument. The reported record of the case consists of the opening presentation by the Attorney General and the separate opinions of the participating Justices. Those opinions, written in the flowery literary style of the day, show that the members of the Court considered the question presented to be a grave one indeed, and that they realized that a tremendous responsibility rested on their shoulders. After a careful consideration thereof, we think it is fair to say (1) that *Chisholm* did *not* abrogate the rule that a sovereign may not be sued without its own consent, and (2) that the true rationale of the opinions is that, by adopting the United States Constitution, the people of Georgia had, in effect, *consented* to be sued in the U.S. Supreme Court.

In his opening presentation, Attorney General Randolph made it clear, at page 442 of 1 L.Ed., that "I acknowledge, and shall always contend, that the states are sovereignties". On the next page, after noting three methods by which, under older British and French governments, relief was in effect obtained as against the sovereign (petitions of right, monstrans de droit, and process in the exchequer), he said that "* * * all of them are widely remote from an *involuntary* subjection, of the sovereign, to the cognizance of *his own* courts" (emphasis supplied).

Justice Iredell was the sole dissenter, being of the view that enabling legislation was required before the Supreme Court could exercise jurisdiction; at page 446 of 1 L.Ed., he said that "This appears to me to be one of those cases, with many others, in which an article of the constitution cannot be effectuated without the intervention of legislative authority".

Justice Blair, after a scholarly consideration of the question, concluded at page 454 of 1 L.Ed., that "* * * it follows that when a state, by adopting the constitution, has agreed to be amenable to the judicial power of the United States, she has, in that respect, given up her right of sovereignty".

Justice Wilson apparently reached the same conclusion. At page 459 of 1 L.Ed., he said:

"The question now opens fairly to our view; could the people of those states, among whom were those of Georgia, bind those states, and Georgia among the others, by the legislative, executive, and judicial power so vested? If the principles, on which I have founded myself, are just and true, this question must unavoidably receive an affirmative answer."

Justice Cushing based his opinion solely upon the Constitution itself, and did not examine the laws and practices of other and older countries, as most of the other Justices did. At page 461 of 1 L.Ed., he said "Whatever power is deposited with the union *by the people* for their own necessary security, is so far a *curtailing* of the power and prerogatives of states" (emphasis added).

The opinion of Chief Justice John Jay is especially scholarly and enlightening. After considering all aspects of the question, he reached an affirmative answer to the question of "* * * whether Georgia has not, by being a party to the national compact, consented to be suable by individual citizens of another state". See page 464 of 1 L.Ed.

The "written remonstrance and protestation" filed by Ingersoll and Dallas on behalf of Georgia is not set out in *Chisholm*, and we are therefore not advised as to the arguments raised therein. It appears, however, that the Justices of the Court considered and discussed all possible objections to the rule that a sovereignty cannot be sued without its own consent, and all possible constructions that could reasonably be placed upon the language quoted from Article III, Section 2.

One of the problems involved was mentioned by Chief Justice John Jay. After concluding that Georgia had, by adopting the United States Constitution, consented to be sued in the United States Supreme Court, he said at page 465 of 1 L.Ed.:

"I perceive, and therefore candor urges me to mention, a circumstance, which *seems* to favor the opposite side of the question. It is this: the same section of the constitution which extends the judicial power to controversies 'between a state and citizens of another state', does also extend that power to controversies to which the United States are a party. Now, it may be said, that if the word, party, comprehends both plaintiff and defendant, it follows, that the United States may be sued by any citizen, between whom and them there may be a controversy. This appears to me to be fair reasoning; but the same principles of candor which urge me to mention this objection, also urge me to suggest an important difference between the two cases. It is this: *in all cases of actions against states* or individual citizens, *the national courts are supported* in all their legal and Constitutional proceedings and judgments, *by the arm of the executive power of the United States; but in cases of actions against the United States, there is no power which the courts can call to their aid.* From this distinction important conclusions are deducible, and they place the case of a state and the case of the United States, *in very different points of view.*" (Emphasis added.)

Possibly in response to the holding in *Chisholm*, the United States Congress, in 1794, purposed the 11th Amendment to the United States Constitution, which was adopted by the people and became effective in 1798. This amendment effectively withdrew from the United States Supreme Court its jurisdiction over controversies between a state and citizens of another state. With the adoption of this amendment, it would seem that, with regard to suits against the state in its own courts without its consent, the "important difference" observed by Chief Justice Jay no longer exists.

Other considerations reinforce this conclusion. It is too well settled to require citation of authority that the taxing power belongs exclusively to the legislative branch of government. In Oklahoma, various restrictions are placed upon the taxing power, including Article X, Sec. 19, of the Oklahoma Constitution, which provides as follows:

"Every act enacted by the Legislature, and every ordinance and resolution passed by any county, city, town, or municipal board or local legislative body, levying a tax *shall specify distinctly the purpose* for which said tax is levied, and *no tax levied and collected for one purpose shall ever be devoted to another purpose.*" (Emphasis added.)

This section has the effect of denying to the judiciary of this state the power to issue execution against funds of the state or a municipality for the collection of money judgments against the state or a municipality rendered in a tort action prosecuted without the state's consent. From the practical standpoint, it may be said to amount to constitutional support for the rule that the sovereign may not be sued without its consent.

Plaintiff also suggests that the rule that the sovereign may not be sued without its consent amounts to a violation of various provisions of the state and federal constitutions. However, no holding to this effect is cited, and we know of none.

In summary: plaintiff's principal argument in favor of a judicial abrogation of the doctrine of sovereign immunity is based upon the proposition that in *Chisholm*, the doctrine was abrogated in toto. As we have seen, this is not the case; on the contrary, the opinions of the participating justices show that they were careful to point out that, by adopting the United States Constitution, the State of Georgia had in effect *consented* to be sued in the United States Supreme Court by citizens of another state—thus showing a compliance with, rather than an abrogation of, the rule that the sovereign may not be sued without its consent.

As a "regrettable alternative" to the abrogation of sovereign immunity, plaintiff argues in effect that the activities of the City of Tulsa in operating the Variety Health Clinic amounted to a proprietary function rather than a governmental function, and that the limitations of the Governmental Tort Liability Act are not applicable.

However, as plaintiff concedes, the Tulsa City-County Health Department was established pursuant to the requirements of 63 O.S.1971, Sec. 1–210 et seq., a portion of the Public Health Code adopted by our Legislature in 1963. An examination of those sections of the statute shows that the language used is mandatory, and not merely directory. The phrase "governmental function" is defined in 11 O.S.1971, Sec. 1752 as "All functions of State Government and all functions of municipalities which are imposed by law, or tend to promote or serve the general health, safety and welfare of the public". Since the activities of the City of Tulsa in operating, through the Tulsa City-County Health Department, the Variety Health Clinic, are required, and not merely permitted, by state law, we hold that they are governmental, rather than proprietary, in nature.

In support of his argument, plaintiff cites several cases such as *City of Okmulgee v. Carlton*, 180 Okl. 605, 71 P.2d 722, in which the activity of the City in operating a hospital was held to be a proprietary function. In that case, decided in 1937, this Court held in the second paragraph of the syllabus by the Court that "Where a municipal corporation *voluntarily* assumes and exercises powers intended for the private benefit and advantage of the locality and [its inhabitants], it is not acting in a governmental capacity * * *" (emphasis added). Of course, in the case now before us, the City of Tulsa was performing a function mandatorily imposed by law, and was not acting voluntarily. The function was therefore governmental, and not proprietary, in nature.

The judgment of the trial court is affirmed.

LAVENDER, V. C. J., and BARNES, SIMMS and HARGRAVE, JJ., concur.

IRWIN, J., concurs in result.

OPALA, J., concurs specially in result.

HODGES, C. J., and DOOLIN, J., dissent.

OPALA, Justice, specially concurring in result:

At issue here, as I view this lawsuit, is not whether, broadly speaking, an Oklahoma municipality may, consistent with the Due Process and Equal Protection Clauses of the Fourteenth Amendment to the Federal Constitution, claim for itself common-law immunity from tort liability because, in the exercise of its "governmental" function, it is possessed with "sovereign" attributes.

"Any attempt to so formulate the issue would fail for want of any respectable federal precedent to give it support."; Rather, the threshold question shaped by the procedural posture of the case before us is the constitutional validity of the since repealed Governmental Tort Liability Act, 11 O.S.

1971 §§ 1751 et seq.,[1] which limits plaintiff's right of recovery herein.[2]

Had I been on the court when *Hamilton v. Oklahoma City*, Okl., 527 P.2d 14 [1974] came for decision, I would have sought to declare the cited act unconstitutional because it is infected with a fatal infirmity in its limitation to cities with a population in excess of 200,000. This restriction is, in my opinion, based on an unreasonable and hence impermissible classification.

But in this case I feel bound by *Hamilton's* precedential force. So long as it stands I must respect that shield it affords. I would, of course, gladly join in overruling *Hamilton* prospectively.

"Should *Hamilton* fall, the common-law rule granting government 'sovereign immunity' from tort liability should be withheld from judicial recognition, effective of course at some convenient date in the future to allow time for enactment of appropriate legislation to fill the void.

"The archaic concept of immunity unfairly singles out our government, *qua* tortfeasor, for a legal treatment that is vastly more favorable than that accorded an ordinary citizen whose actionable conduct inflicts injury on another person.[3]

"There can be no question at this late date about our power, both by force of statute and the common law, to change *any* outdated norm that owes its origin and continued existence to judge-made law.[4]"

So long as there is life in *Hamilton* I feel constrained to concur in result.

---

1. Replaced initially by the provisions of 11 O.S. Supp. 1977 §§ 23–201 et seq., effective July 1, 1978, and then by the Political Subdivision Tort Claims Act, 51 O.S.Supp. 1978 §§ 151–170.

2. My formulation of the dispositive issue results from my firm opinion that municipal vaccination services, in connection with which the tort herein is alleged to have been committed, constituted a "governmental" function.

3. Judicial recognition could be effectively withdrawn in those instances where the sovereign-immunity rule has not received legislative sanction or where it is found to have been unconstitutionally enacted. Municipal immunity has recently been codified, effective July 1, 1978, in 11 O.S.Supp. 1977 § 23–210, but was then repealed by 51 O.S.Supp. 1978 § 161, and replaced with a legislative declaration of liability in 51 O.S.Supp. 1978 § 153.

